UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

NICOLE EBRON,                                    :
                                                 :
                          Plaintiff,             :
                                                 :     ECF CASE
              v.                                 :
                                                 :     08 Civ. 144 (AJP)
THE UNITED STATES OF AMERICA,                    :
                                                 :
                          Defendant.             :
                                                 :
-------------------------------------------------------------- x

## <u>DECLARATION OF TOMOKO ONOZAWA</u>

TOMOKO ONOZAWA, pursuant to 28 U.S.C. § 1746, declares the following under

penalty of perjury:

1.      I am an Assistant United States Attorney in the office of Michael J. Garcia,

United States Attorney for the Southern District of New York, attorney for defendant United

States  ("the Government") in the above-captioned case.

2.      I submit this declaration in support of the Government's Motion *in Limine* to

Exclude Certain Evidence at Trial.

3.      Annexed hereto as Exhibit A is a true and correct copy, dated July 8, 2008, of

plaintiff's Fed. R. Civ. P. 26(a)(2) disclosure of her intent to call Dr. Kenneth Ackerman, M.D.,

as a testifying expert at trial.

4.      Annexed hereto as Exhibit B is a true and correct copy of the expert report of

Kenneth Ackerman, M.D., dated July 8, 2008, that was produced as part of plaintiff's Rule 26

expert disclosure in the above-captioned case.

5.      Annexed hereto as Exhibit C is a true and correct copy of excerpts from the

transcript of Kenneth Ackerman's deposition in this matter, taken on August 13, 2008.

6.      Annexed hereto as Exhibit D is a true and correct copy of excerpts from the

transcript of plaintiff Nicole Ebron's deposition in this matter, taken on July 31, 2008.

7.      Annexed hereto as Exhibit E is a true and correct copy of Plaintiff's Supplemental

Response to the Government's Interrogatories in this action, dated May 27, 2008.

I declare that the foregoing is true and correct pursuant to the penalties of perjury at 28

U.S.C. § 1746.

Dated: New York, New York
       September 9, 2008

                              By:      /s/  Tomoko Onozawa
                                     TOMOKO ONOZAWA

- 2 -

# EXHIBIT A

POPKIN & POPKIN, LLP.
By : ERIC F. POPKIN (9578)
209 WEST 97TH STREET
SUITE 7(C)
NEW YORK, NY., 10025
Telephone : 212 662-2969
Facsimile : 212 531-1116
E-mail : Lizjackpoplaw@aol.com


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
NICOLE EBRON,

                              Plaintiff             ECF Case

          -against-                   08 Civ. 0144 (RMB) (AJP)

UNITED STATES OF AMERICA,        EXCHANGE OF EXPERT
                                       PURSUANT TO FEDERAL
                                       RULE 26 (a)(2)

                          Defendant,

-----------------------------------------------------X
        PLEASE TAKE NOTICE that, Pursuant to Rule 26(a)(2) of the Federal Rules of

Civil Procedure, plaintiff. Nicole Ebron ("plaintiff"), by her attorneys, Popkin & Popkin,

LLP., makes the following disclosure and does hereby give notice of the plaintiff's

intention to call Dr. Kenneth R. Ackerman, M.D., as an expert witness at the time of trial

on the issues of the defendants' negligence and medical malpractice, as well as the

plaintiff's injury and damages.  Dr. Kenneth R. Ackerman, M.D., maintains an office for

the practice of medicine at 277 Northern Boulevard, Great Neck, N.Y.,11021.

        1.     It is anticipated that at the time of trial that Dr. Ackerman, M.D., will

testify as to the defendants' departure from good and accepted medical practice and

procedure in the care and treatment that the defendant provided Ms. Nicole Ebron.  It is

also anticipated that Dr. Ackerman, M.D. will offer the opinion that the defendants failed to properly prepare Ms. Ebron's tetanus injection site for the tetanus injection that was given to Ms. Nicole Ebron and that the failure to properly prepare the tetanus injection site prior to the tetanus injection was a deviation from good and accepted medical practice and procedure which led to, and was the cause of, the infection and the scarring sustained by Ms. Ebron. It is further anticipated that Dr. Ackerman, M.D.'s Testimony will be that the scarring sustained by Ms. Ebron was the result of the defendants negligence and medical mal practice and that the scarring is permanent.

2.     The basis of Dr. Ackerman, M.D.'s testimony will be his education and training in the field of medicine, his preparation of tetanus and other injection sites, the doctors administration of tetanus and other injections, as well as the doctors review of the medical records exchanged by the plaintiff and the defendants in compliance with the Rule 26 exchange, including but not limited to the defendants' care and treatment records for Ms. Nicole Ebron; as well as discussion with the plaintiff and all of the testimony and exhibits admitted into evidence at the time of trial.

3.     It is anticipated that Dr. Ackerman, M.D., at the time of his testimony, will use and rely on all of the medical records marked as exhibits and admitted into evidence, as well as an anatomically correct diagram of the arm.

4.     Dr. Ackerman, M.D., received his medical degree from Stony Brook University. He is licensed to practice medicine by the State of New York, having obtained his license in 1989. Dr. Ackerman, M.D., is Board Certified in internal medicine having passed his examinations in 1991 and 2000.

5. In the past four years Dr. Ackerman, M.D., has appeared as an expert  and

given expert testimony in the following :

        a.)    <u>Usdan v. Horowitz.</u>

6.    Dr. Ackerman, M.D., has been compensated for his review of the relevant information and his report of his findings in the amount of Five Hundred ($500.00) Dollars. Dr. Ackerman, M.D., Will be compensated in the amount of Two Thousand and Five Hundred ($2,500.00) Dollars for his trail appearance.

PLEASE TAKE FURTHER NOTICE that, the plaintiff reserves the right to seasonably amend and/or make corrections to this response in compliance with Rule 26 (e)(1) of the Federal Rules of Civil Procedure as needed.

Dated : New York, New York
      July 8, 2008

                            POPKIN & POPKIN, LLP.
                            Attorneys for Plaintiff

                            By : ERIC F. POPKIN (9578)
                            209 WEST 97TH STREET
                            SUITE 7(C)
                            NEW YORK, NY., 10025
                            Telephone : 212 662-2969
                            Facsimile : 212 531-1116
                            E-mail : Lizjackpoplaw@aol.com

CERTIFICATION OF SERVICE

I, Eric F. Popkin, a partner at the offices of Popkin & Popkin, LLP., attorneys for

the plaintiff, hereby certify that on July 14, 2008, I caused a copy of the foregoing

EXCHANGE OF EXPERT PURSUANT TO FEDERAL RULE 26 (a) (2) to be

personally served upon the following :

> Tomoko Onozawa
> Assistant United States Attorney
> Offices of Michael J. Garcia
> United States Attorney for the
> Southern District of New York
> 86 Chambers Street, Third Floor
> New York, N.Y., 10007

Eric F. Popkin

# EXHIBIT B

Kenneth R. Ackerman, M.D.
277 Northern Boulevard
Great Neck, N.Y. 11021
516-829-7750

Date: July 8, 2008

Re : Nicole Ebron

I have spoken to Nicole Ebron and reviewed her care and treatment records. Based on my review of all of the information made available to me, I have formed the following opinion:

An injection was performed without appropriate skin preparation. Preparing the skin properly is a standard technique that should be followed at all times. The patient subsequently developed a significant skin injection at the injection site this led to the need for the incision and drainage of the infected injection site and the pateints prolonged use of antibiotics.

Within a reasonable degree of medical certainty, the infection was caused by the improper injection technique.

The failure to prepare the injection site by proper cleansing is a departure from the standard of care and is a causal result of the injury in this case.

The defendants' departed from good and accepted medical practice and procedure in the care provided to Ms. Nicloe Ebron. The defendants' failure to properly prepare the tetanus injection site was a deviation from good and accepted medical practice and procedure. Further, it was this deviation from good and accepted practice, care and procedure which led to and was the cause of the infection and the scarring sustained by Ms Ebron. Additionally the scarring sustained by Ms. Ebron is permanent.

The basis my opinions are my education and training in the field of medicine, preparation of tetanus and other injection sites as well as the administration of tetanus and other injections, and a review of the my review of all of the information which was made available to me. .

I will use and rely on all of the medical records marked as an exhibit and admitted into evidence, as well as an anatomically correct diagram of the arm.

I received my medical degree from Stony Brook Univerisity in New York. I am licensed to practice medicine by the State of New York, having obtained my license in 1989. I am Board Certified in Internal Medicine having passed my exams in 1991 and 2000.

In the past four years, I have appeared as an expert and given expert testimony in the following matter in New York State:

    a. Usdan v. Horowitz

To date I have been compensated in the amount of Five Hundred ($ 500) Dollars. For appearing at trial, I will receive additional compensation in the amount of Two thousand and Five Hundred ( $2,500.00) Dollars.

Sincerely yours,

Kenneth R. Ackerman, M.D.

# EXHIBIT C

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------------

NICOLE EBRON,

        Plaintiff,

                      Civil Action

                      No:
  -against-           08Civ.0144
                      (RMB)(AUP)

UNITED STATES OF AMERICA,

        Defendant.

----------------------------------------

        DEPOSITION OF KENNETH R. ACKERMAN,

M.D., an expert witness herein, taken by

Defendant, pursuant to notice, held at the

offices of Kenneth R. Ackerman, M.D., 277

Northern Boulevard, Suite 318, Great Neck, New

York 11021, on Wednesday, August 13, 2008, at

2:42 p.m., before HELGA CHRISTIANE LAVAN, a

Registered Professional Reporter and notary

public, within and for the State of New York.

Kenneth R. Ackerman                            August 13, 2008

Page 40

                        K. Ackerman

1

2       A.   No.

3       Q.   Why is that?

4       A.   Again, it's the custom and practice

5   to do it each and every time.

6       Q.   Now, when you arrived at your expert

7   opinion you made certain factual assumptions,

8   right?

9       A.   Yes.

10      Q.   Would your opinion change if the

11  nurse had used an alcohol swipe to prepare the

12  skin for administering the vaccine?

13      A.   Yes, it would.

14      Q.   So if she used an alcohol swipe to

15  prepare the skin, that wouldn't be a deviation

16  from good and standard medical practice; is

17  that right?

18      A.   Right.

19      Q.   Aside from your opinion that the

20  infection was caused by the failure to

21  properly prep the site, are you offering any

22  other opinions in this case?

23      A.   No.

24           MR. POPKIN:   Objection.  What do you

25  mean?

Kenneth R. Ackerman                                August 13, 2008

Page 41

1                    K. Ackerman

2          MS. ONOZAWA:  Well, are there any

3     other opinions within your scope of an expert

4     that you're offering in this case?

5          MR. POPKIN:   He's offering opinions

6     whether or not there was a malpractice.

7          MS. ONOZAWA:  He just answered no.

8       Q.  Do you understand the question?

9          MR. POPKIN:  I don't understand the

10    question so I'll object to the question.

11      A.  I don't intend to offer any opinions

12    as to any other departures.

13      Q.  So the only departure that you have

14    offered an opinion on is the failure to prep

15    the site; is that correct?

16      A.  That's correct.

17      Q.  So you're not offering an expert

18    opinion on whether the defendant disclosed to

19    Ms. Ebron the risks and benefits of receiving

20    the shot?

21      A.  No.

22      Q.  You're not offering an expert opinion

23    on whether the defendants failed to properly

24    treat the infection after it happened?

25      A.  That's correct.

Kenneth R. Ackerman                        August 13, 2008

Page 42

1                    K. Ackerman

2        Q.  Now, you said that you derived

3    certain facts about this case based on your

4    conversations with plaintiff; is that right?

5        A.  Yes.

6        Q.  When you spoke to her did you have

7    any reason to believe that she might be

8    misrepresenting the facts based on the fact

9    that she was a plaintiff?

10       A.  No.

11       Q.  So you accepted everything that she

12   said as truthful and accurate?

13       A.  Yes.

14       Q.  Just to confirm, your expert report

15   doesn't touch on the issue as to whether Ms.

16   Ebron properly received notice of the risks

17   and benefits of the vaccine; is that right?

18            MR. POPKIN:   Objection.  You can

19   answer it.

20       A.  That's correct.

21       Q.  Am I also right that your expert

22   report doesn't provide an opinion on the issue

23   as to how the appropriateness of the treatment

24   Ms. Ebron received after she got the

25   infection; is that correct?

Kenneth R. Ackerman                                August 13, 2008

Page 43

1                        K. Ackerman

2          A.   That's correct.

3          Q.   You said earlier that you haven't

4     read any other deposition transcripts in this

5     case; is that right?

6          A.   That's correct.

7          Q.   Would it help your expert opinion to

8     read any of those transcripts?

9          A.   I don't know.

10          Q.   Do you think it would have been

11     useful to read any deposition transcripts from

12     the doctor and the nurse who administered the

13     shot?

14          A.   It may or may not have.

15          Q.   When you formed your expert opinion

16     did you consult any other materials, for

17     example, treatises or articles?

18          A.   No, I did not.

19          Q.   Just going back to the notes that you

20     said you prepared, was that at the request of

21     counsel?

22          A.   Yes.

23          Q.   Were those notes prepared before or

24     after your expert report?

25          A.   They're all one in the same.

Kenneth R. Ackerman                         August 13, 2008

Page 44

1                    K. Ackerman

2        Q.   Those notes were used in the

3    preparation of your expert report?

4        A.   Yes.

5             MR. POPKIN:   His notes, are they

6    your expert report, is that what you're

7    saying?

8             THE WITNESS:   Yes.

9             MR. POPKIN:   So they are your

10   report, not just you prepared them.

11            THE WITNESS:   Yes.

12       Q.   You referred to notes that you

13   referred to in preparation of this deposition;

14   correct?

15       A.   Yes.

16       Q.   But that wasn't your expert report?

17       A.   Yes, it was.

18       Q.   It was your expert report?

19       A.   Yes.

20            MS. ONOZAWA:   I have no further

21   questions.

22            MR. POPKIN:   Doctor, I have just a

23   couple of questions for you.

24   EXAMINATION BY

25   MR. POPKIN:

Kenneth R. Ackerman                          August 13, 2008

Page 45

1                    K. Ackerman

2          Q.   In giving a tetanus shot is it proper

3     practice and procedure in your opinion to a

4     degree of medical certainty to inform a

5     patient of the risk of infection from

6     giving -- just from giving a shot?

7          A.   In general no.

8          Q.   If there is no preparation of the

9     injection site does your opinion change on

10    whether or not the patient should be notified

11    of the risk of infection?

12         A.   Yes it does.

13         Q.   In what way does it change?

14         A.   Well, you would want to tell them

15    that the risk is significantly increased by

16    not preparing the injection site.

17         Q.   From a medical practitioner's point

18    of view, why has that become important in

19    informing the patient of that information?

20         A.   Because they always have the option

21    not to take the shot.

22         Q.   Does the risk of infection from a

23    tetanus shot increase with the lack of proper

24    preparation?

25         A.   It would increase in any type of

d4cabbf2-62db-42b0-a180-f43ae53e610b

Kenneth R. Ackerman                           August 13, 2008

Page 46

1                    K. Ackerman

2     shot.

3         Q.    That failure to properly prepare, is

4     that something which affects the need to

5     inform a patient of the risk of the procedure?

6         A.    Absolutely.

7         Q.    Is it because of the increased risk

8     of infection that that need to inform becomes

9     important?

10        A.    Yes.

11        Q.    Thank you, Doctor.

12             In this particular case I want you to

13    assume, as you have in this matter, that

14    proper preparation wasn't given.  I want you

15    to further assume that after the proper

16    preparation was not done by Ms. Gilmore, that

17    she did not inform the patient of the risks,

18    increased risks of infection.

19             Now, for the purposes of this

20    question I want you to assume that all that's

21    been testified to at her deposition is true --

22    when I say her deposition, Ms. Gilmore -- as

23    far as not giving any notification of the

24    risks.  Do you have an opinion to reasonable

25    degree of medical certainty whether that

d4cabbf2-62db-42b0-a180-f43ae53e610b

Kenneth R. Ackerman                              August 13, 2008

Page 47

1                      K. Ackerman

2       failure to inform the patient and get the

3       patient's consent under that fact pattern is a

4       deviation of good accepted medical practice

5       and procedure?

6            A.   Yes.

7            Q.   What was that opinion?

8            A.   That it is a departure of good and

9       acceptable medical practice to perform a

10      procedure such as that without obtaining the

11      appropriate consent in that situation.

12               MR. POPKIN:   Thank you, Doctor.

13               MS. ONOZAWA:   I have one follow-up

14      question.

15      CONTINUED EXAMINATION

16      BY MS. ONOZAWA:

17           Q.   When did you receive the medical

18      records that you reviewed in preparation for

19      the expert report?

20           A.   Like I said, probably the end of June

21      or so.

22           Q.   Did you receive any medical records

23      after that?

24           A.   Not that I'm aware of.

25               (Continued on next page.)

# EXHIBIT D

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------
NICOLE EBRON,

      Plaintiff,

                    Civil Action No.
   -V-             08 CV 00144

UNITED STATES OF AMERICA,

      Defendant.
-----------------------------


      DEPOSITION OF NICOLE EBRON, the

Plaintiff herein, taken by Defendant, pursuant

to Order, at the offices of the U.S. Attorney,

86 Chambers Street, New York, New York, on

Thursday, July 31, 2008, at 10:15 a.m., before

Margaret Eustace, a Shorthand Reporter and

notary public, within and for the State of New

York.

Nicole Ebron                                          July 31, 2008

1                        N. Ebron

2    I remember I called a cab, I went to Jacobi.

3        Q.   What time did you go?

4        A.   I don't even remember exactly the

5    time but I do remember it was before 7:00 or

6    8:00 in the morning, because I got up very

7    early, maybe 6:00, and my neighbor -- no, my

8    sister had my daughter.

9            I went to Jacobi.  I was there for

10   hours.  The nurse actually looked at my arm,

11   when she did my vitals.  And she said, "Oh, my

12   God, what happened to your arm?"

13           I still at the time didn't know that

14   it was because of the injection.  And she said

15   to me, when I explained to her what happened,

16   and I said, "I don't know what happened to my

17   arm.  I just went for a physical and I had got

18   a tetanus shot."

19           And she said that that looks like --

20   I can't remember the word, salmonella or

21   something like that.  A word familiar with

22   that word.  And she said, "Were you injected

23   without an alcohol swipe?"

24       Q.   She said that to you?

25       A.   Yes.

c7e00c3c-2e69-4b7e-b0fa-50d9443a3012

Nicole Ebron                                      July 31, 2008

1                        N. Ebron

2            So I said yes.  And she said --

3       Q.   It was then that you remembered?

4       A.   Yes.

5       Q.   It hadn't occurred to you before

6  then?

7       A.   Right.  I never thought that it would

8  be from that, you know.  I had no reason to

9  think that it would come from that.  And when

10  she said that, I started crying so bad.

11           And she said, "It's okay.  You came

12  just in time."

13       Q.   Do you remember the name of this

14  nurse?

15       A.   No.

16       A.   So then I remember I waited for a

17  while.  The doctor called me in.

18       Q.   How long did you wait?

19       A.   Maybe about an hour.

20           The doctor called me in, and the

21  doctor said, "Wow, that's ugly."  And then he

22  asked me what happened.  And I explained to

23  him what happened.

24       Q.   When you said you explained to him

25  what happened, what exactly did you say?

Nicole Ebron                                    July 31, 2008

1                          N. Ebron

2          A.   I explained to him that I went to the

3     doctor to get a physical and I had got a

4     tetanus shot.  And I still didn't think that

5     it was because I didn't get swiped.

6               He also asked me was the site cleaned

7     before you got the injection.  So I said,

8     "No."  I still said, "Why?"  Like I didn't

9     know it made a difference.

10              And he said, "That's why your arm is

11     like that."  And he said, "You are always

12     supposed to be prepped first before you get

13     injected with any form of a needle."

14              So I am really upset now.  I am

15     hysterical and I am saying, "Am I going to

16     die?  Is my arm going to get cut off?  Am I

17     going to catch a disease?"  I am thinking all

18     of these things in my mind.

19              So he said, "This is going to be

20     really bad.  I am going to have to lance your

21     arm."  I didn't know what that meant at the

22     time, so he told me he had to cut my arm open

23     and I was really afraid.  I was by myself.  I

24     was just so upset --

25          Q.   I'm sorry.

Nicole Ebron                                   July 31, 2008

Page 84

1                         N. Ebron

2              Did you say your sister went with

3       you?

4         A.    No, my sister had my daughter.

5         Q.    You went by yourself in a cab?

6         A.    Yes.

7         Q.    Go ahead, I'm sorry.

8         A.    So then I remember that he told me he

9       was going to numb the area and he was going to

10      lance my arm.

11             Once he did that, once he started to

12      open the knot up, he said, "Oh, wow.  I have

13      never seen this much," he called it another

14      word for pus.  There is another word for it.

15      And he said, "You came just in time."  He

16      said, "If you had waited one more day, this

17      pus would have poisoned your system."  He

18      said, "This is really bad."

19             So I said, "Oh, my God."

20             He said, "Who did this?  What doctor

21      did you go to?"  So I gave him the bottle

22      because I was so upset, I couldn't event think

23      of the doctor --

24        Q.    Which bottle?

25        A.    The Biaxin.  It had the address on

Nicole Ebron                                                    July 31, 2008

Page 85

1                          N. Ebron

2    it, because I couldn't even think at the time.

3    So I showed him.  I said, "This is the

4    address."

5        Q.   Then he said, "Is this your

6    medication?"

7             I said, "Yes."

8             He said, "Who gave this to you?"

9             I said, "My doctor prescribed it to

10   me."

11            And he said, "For what?"

12            So I said, "For my arm.  He said it's

13   infected and it will go away.  It will bust on

14   its own."

15            He said, "This is not the antibiotic

16   that he should have given you.  Throw this

17   away."

18            And I was afraid.  I said, "Okay,"

19   and I didn't throw it away.  I just put it in

20   my pocketbook.  And he said, "He should have

21   never given you that medication.  That is not

22   a medication for what you have."

23            And then he did everything that he

24   had to do, which it took him quite a while.

25   Maybe 20 minutes to drain all the pus out of

Nicole Ebron                                    July 31, 2008

Page 112

1                      N. Ebron

2          Q.   Any other symptoms at the site of the

3     injection?

4          A.   No.

5          Q.   Just the shooting pain?

6          A.   Yes.

7          Q.   Do you know why you are suffering

8     from these shooting pains?

9          A.   No -- I know why, because of the

10    injury that happened to my arm.

11         Q.   Did a doctor tell you that?

12         A.   No.

13         Q.   Anybody tell you that?

14         A.   No.

15         Q.   Is there anything that you did on a

16    regular basis before January 2004 that you no

17    longer can do now?

18         A.   No.

19         Q.   Has any doctor put restrictions on

20    your activities because of the injury you

21    suffered in January 2004?

22         A.   No.

23         Q.   Do you expect to receive any further

24    medical treatment for the injuries you are

25    claiming in this lawsuit?

Nicole Ebron                                    July 31, 2008

Page 113

1                     N. Ebron

2        A.   No.

3        Q.   Has any doctor told you that there

4   might be necessary surgeries in the future?

5        A.   No.

6        Q.   Has anybody prescribed physical

7   therapy for any injuries you suffered as a

8   result of what happened in January 2004?

9        A.   No.

10       Q.   So other than what you have testified

11   to so far this morning, have you had any other

12   conversations with any doctor regarding the

13   tetanus vaccination you had in January 2004?

14       A.   From Parkchester Family Practice?

15       Q.   Anybody other than the doctors you

16   have testified about so far in Parkchester and

17   Jacobi?

18       A.   No.

19       Q.   Have you had any conversations with

20   any nurse?

21       A.   No.

22       Q.   Any other medical practitioner?

23       A.   No.

24       Q.   You identified earlier four

25   individuals who have knowledge about what

Nicole Ebron                                              July 31, 2008

Page 116

```
 1                    N. Ebron
 2    from your last visit at Parkchester until the
 3    day you signed your retainer agreement?
 4        A.  No.
 5        Q.  But you spoke to him in February of
 6    '04?
 7        A.  Yes.
 8        Q.  Did you speak with any other lawyer?
 9        A.  No.
10        Q.  Did anyone suggest to you that you
11    should bring a lawsuit?
12        A.  No.
13        Q.  This was of your own volition?
14        A.  Yes.
15        Q.  Now, how have you paid for medical
16    care relating to the site of the injection?
17        A.  I have insurance.
18        Q.  What kind of insurance is that?
19        A.  Medicaid.
20        Q.  Do you have any other kind of
21    insurance?
22        A.  No.
23        Q.  Now, did you receive bills for any
24    medical treatment relating to that injection?
25        A.  No.
```

Nicole Ebron                                         July 31, 2008

1                        N. Ebron

2        Q.   You never received any bills?

3        A.   No.

4        Q.   Do you have any documents showing how

5    much your medical treatment cost?

6        A.   No.

7        Q.   Did you pay any medical bills?

8        A.   No.

9        Q.   So all of it, 100 percent of that was

10   reimbursed by Medicaid?

11       A.   Yes, I believe so.

12       Q.   And none of it was covered by Social

13   Security?

14       A.   No, I don't receive any of that.

15       Q.   State disability?

16       A.   No.

17       Q.   Workers' Comp?

18       A.   No.

19       Q.   So did you pay -- with respect to

20   your medical treatment, did you pay any -- you

21   haven't paid any bills; is that correct?

22       A.   That's correct.

23       Q.   Has anyone else paid for your bills?

24       A.   No.

25       Q.   So all of this was covered by

Nicole Ebron                                        July 31, 2008

Page 118

1                    N. Ebron

2    Medicaid?

3         A.   Yes.

4         Q.   But you don't have any records by

5    Medicaid?

6         A.   No.

7         Q.   If you could take a look at

8    Government's Exhibit 4?

9         A.   Yes.

10        Q.   In paragraph 9A, you estimated $4,200

11   for past medical expenses?

12            MR. POPKIN:   Right here.

13        A.   Yes.

14        Q.   That is correct?

15        A.   Yes.

16        Q.   Are these for bills from Parkchester,

17   the Jacobi emergency room and Jacobi urgent

18   care wound specialist?

19        A.   Yes.

20        Q.   And this amount is your understanding

21   of the bills you received?

22        A.   Yes.

23        Q.   So you did receive bills?

24        A.   Not directly to me.

25        Q.   Where were they sent to?

Nicole Ebron                                    July 31, 2008

1                          N. Ebron
2              MR. POPKIN:   She is asking if you
3      know where those bills were sent?
4              THE WITNESS:   No.
5          Q.  Have you ever seen these bills?
6          A.  No.
7          Q.  So how did you come up with the
8      estimate of $4,200 of past medical expenses?
9              MR. POPKIN:  It is contained within
10     what has been marked as Government's 4
11     already.  Her recollection is set out in here.
12     I don't understand your question.
13         Q.  Do you understand my question?
14         A.  Not really.
15         Q.  You just said that you never saw the
16     medical bills?
17         A.  No.
18         Q.  So how did you recall that you had
19     $4,200 in past medical expenses?
20         A.  I don't know how to answer that.
21         Q.  Did anyone help you with this
22     estimate?
23         A.  No.
24         Q.  Have you undertaken any efforts to
25     obtain copies of those bills?

Nicole Ebron                                    July 31, 2008

Page 120

1                          N. Ebron

2      A.  No.

3      Q.  Are you in a position to request

4  copies of those bills?

5      A.  No.

6      Q.  So you have no personal knowledge of

7  how this $4,200 in past medical expenses was

8  calculated?

9      A.  No.

10     Q.  In your discovery responses that is

11  same exhibit, Government's 4, paragraph 9K, if

12  you can look at that.

13         MR. POPKIN:   Hold on a second.

14         Okay.

15     Q.  You estimated $1,450 for past

16  out-of-pocket expenses.

17         MR. POPKIN:   Do you see that?

18         THE WITNESS:   Yes.

19     Q.  And it's for medication, bandaging

20  scars, vitamins ointments, things which were

21  and continue to be needed for use in the care

22  of your injury.

23         MR. POPKIN:  As well as the cost of

24  transportation to and from doctors, hospitals

25  and clinics and for the care of injury.

Nicole Ebron                                    July 31, 2008

1                      N. Ebron

2            And it says plaintiff is not in

3     possession of documents, business receipts on

4     which this amount is based.

5        Q.  How did you come up with an estimate

6     of $1,450?

7            MR. POPKIN:   You mean other than

8     what it says in 9K?

9            MS. ONOZAWA:   Correct.

10            MR. POPKIN:   If there is any other

11     basis, let her know.

12        A.  No.

13        Q.  Did someone assist you with this

14     estimate?

15        A.  No.

16        Q.  Is there any way of verifying the

17     accuracy of this estimate?

18        A.  No.

19        Q.  Is there any way of verifying the

20     accuracy of the $4,200 for past medical

21     expenses listed in paragraph 9A?

22        A.  No.

23        Q.  I am going to keep asking questions

24     about that.

25            Paragraph 9L, you said you are

Nicole Ebron                                    July 31, 2008

1                    N.  Ebron

2    understanding.  Where did it come from.

3        Q.  Okay, let me break it down.

4            Did someone tell you that your future

5    out-of-pocket costs would be $4,400?

6        A.  No.

7        Q.  Did you see any documents showing

8    that your future out-of-pocket expenses would

9    be $4,400?

10       A.  No.

11       Q.  Did you make any calculations when

12   you came up with damages in the amount of

13   $4,00 for future out-of-pocket expenses.

14           MR. POPKIN:  That is a calculation.

15           What do you mean by that?

16       Q.  Did you personally calculate that

17   amount?

18       A.  You mean did I add that amount up?

19       Q.  Yes.

20       A.  No.

21       Q.  When was this $4,400 for future

22   out-of-pocket expenses calculated?

23       A.  I am not sure exactly.

24       Q.  What are these $4,400 future

25   out-of-pocket costs, expenses supposed to pay

Nicole Ebron                                              July 31, 2008

Page 125

1                          N. Ebron

2       for?

3              MR. POPKIN:   You can read it to her

4       again.

5          A.   For the scarring of the injury

6       site --

7          Q.   Right, but does that include -- you

8       have a very specific list in the previous

9       paragraph:  Medication, bandage, gauze,

10      vitamins, ointments, creams, et cetera.

11             Is that what the $4,400 for future

12      care is --

13         A.   Yes.

14         Q.   It is?

15         A.   Yes.

16         Q.   So other than medications -- future

17      medications, bandages, gauze, vitamins,

18      ointments, creams which will be needed in the

19      future to care for this injury, is there

20      anything else that might be included in these

21      future out-of-pocket expenses other than what

22      you have in paragraph 9L?

23         A.   No.

24         Q.   Paragraph 9B, the same exhibit, says

25      you are seeking damages in the amount of

1                     N. Ebron

2    $11,800 for future medical expenses; is that

3    correct?

4        A.  Yes.

5        Q.  On the second page, it says here the

6    basis of the amount set forth in Response 9B

7    is the reasonable cost for revision or

8    revisions, surgeries for correction of

9    scarring; is that correct?

10          MR. POPKIN:  As well as the

11    reasonable cost --

12          MS. ONOZAWA:  Can you just let me

13    finish.

14          MR. POPKIN:  Sure.

15        Q.  Is that what it says?

16        A.  Yes.

17        Q.  I will ask about everything in this

18    paragraph, but let me just focus on revision

19    surgery.

20          What is the reasonable cost of

21    revision surgery for correction of the

22    scarring?

23        A.  I am confused.  I don't know.

24        Q.  Did you consult with any surgeon with

25    respect to correcting the scar?

c7e00c3c-2e69-4b7e-b0fa-50d9443a3012

Nicole Ebron                                    July 31, 2008

Page 127

1                          N. Ebron

2         A.   I want to get it corrected, yes.

3         Q.   Have you consulted with anybody about

4    getting that corrected?

5         A.   No.

6         Q.   Do you know how much it will cost for

7    you to get it corrected?

8         A.   No, not exactly.

9         Q.   Are there any documents showing how

10   much it might cost to get it corrected?

11        A.   No, I don't have any.

12        Q.   And 9B also includes the reasonable

13   cost of after-care treatment such as would be

14   required following said revision surgery; is

15   that correct?

16        A.   Yes.

17        Q.   What would be -- has anyone told you

18   what the reasonable cost of after-care

19   treatment following revision surgery will be?

20        A.   No.

21        Q.   Do you have any written documentation

22   showing what the reasonable cost of after-care

23   treatment following surgery would be?

24        A.   No.

25        Q.   Do you know of any way of finding out

Nicole Ebron                                          July 31, 2008

Page 128

```
 1                    N. Ebron
 2    what the reasonable cost of revision surgery
 3    for correction of scarring will be?
 4          A.  No.
 5          Q.  Do you have any way of finding out
 6    what the reasonable cost of after-care
 7    treatment after the surgery would be?
 8          A.  No.
 9          Q.  When did you consider revision
10    surgery for correcting the scar?
11          A.  Say that again?
12          Q.  When did you first consider getting
13    surgery to correct the scar?
14          A.  Immediately.
15          Q.  In January of '04?
16          A.  Yes.
17          Q.  But you haven't consulted with
18    anybody since then?
19          A.  Not yet, no.
20          Q.  I'm sorry, I just wanted to ask you
21    further, going back to the second page, the
22    same paragraph that I was reading to you
23    earlier.  Starting, "The basis of the amount
24    set forth."
25              The last paragraph says, "The basis
```

Nicole Ebron                                        July 31, 2008

Page 129

1                        N. Ebron

2     for such costs are from information relayed to

3     the plaintiff."

4              Can you describe to me what

5     information that is?

6        A.   About my scar?

7        Q.   Well, the basis for those costs.

8        A.   No.

9        Q.   So you don't have any information

10    relating to the basis for the cost of revision

11    surgery or after-care treatment?

12       A.   No.

13       Q.   Now in Government's Exhibit 4,

14    paragraph 9E, you said you are seeking

15    $150,000 for past pain and suffering; is that

16    correct?

17       A.   Yes.

18       Q.   And in subparagraph 9F, you are

19    seeking $335,000 for future pain and

20    suffering?

21       A.   Yes.

22       Q.   What has been your pain and suffering

23    to date?

24       A.   Just physical and mental.  The mental

25    more than anything.  Even for my daughter,

# EXHIBIT E

POPKIN & POPKIN, LLP.
By : ELIZABETH J. POPKIN
209 WEST 97TH STREET
SUITE 7(C)
NEW YORK, NY., 10025
Telephone : 212 662-2969
Facsimile : 212 531-1116
E-mail : Lizjackpoplaw@aol.com



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
NICOLE EBRON,

       Plaintiff     ECF Case

   -against-       08 Civ. 0144 (RMB) (AJP)
UNITED STATES OF AMERICA,   SUPPLEMENTAL
            RESPONSE TO
            INTERROGATORIES

       Defendant,
-----------------------------------------------------X

   Plaintiff repeats and reiterates her Response to Interrogatories as if more fully set

forth at length herein.

9.  For damages claimed by plaintiff, state the amount of damages, set forth the

computation used to arrive at that amount, and identify the documents upon which the

computation is based, for each of the following categories of damages;

| | | |
|---|---|---|
| a. | Past medical expenses | $ 4,200.00 |
| b. | Future medical expenses | $ 11,800.00 |
| c. | Past lost earnings or other income | N/A. |
| d. | Future lost earnings or other income | N/A. |
| e. | Past pain and suffering | $ 150,000.00 |
| f. | Future pain and suffering | $ 335,000.00 |
| g. | Past loss of services | N/A. |

| h. | Future loss of services | N/A. |
| i. | Past loss of society | N/A. |
| j. | Future loss of society | N/A |
| k. | Past out-of-pocket expenses | $ 1,450.00 |
| l. | Future out-of-pocket expenses | $ 4,400.00 |
| m. | Other damages | N/A. |

Your response to this interrogatory should include, but not be limited to, all of the information required to be disclosed pursuant to Rule 26(a)(1)(A)(iii)

The basis of the amount set forth in response 9a., is the plaintiff recollection of amount of the bills for the service rendered during her care and treatment for the injury sustained in this matter at  the by Parkchester Family Practice, Jacobi Medical Center Emergency Room and, by the Jacobi Urgent Care Wound Care Specialist. Plaintiff is not currently in posesion of a copy of the bills but has undertaken an effort to obtain the relevant bills and shall supply a copy of such when the bills are received.

The basis of the amount set forth in response 9b., is the reasonable cost of revision(s) surgery for correction of the scarring as well as the reasonable cost of after care treatment such as would be required following said revision(s) surgery. The basis for such costs are from information relayed to the plaintiff and for which the plaintiff is not in posesion of any documents.

The basis of the amounts set forth in responses 9e. and 9f., are the plaintiff's belief as to what fair and adequate compensation would be for her past pain and suffering over the past four plus years and future pain and suffering for the permanent injuries sustained over the remaining years of her life as based on the Life Expectancy Tables

presented by the National Center for Health Statistics, Vital Statistics of the United States, Volume II, Mortality Part A, Section 6, as published in the National Vital Statistics Reports Vol. 47, No. 28 (December 13, 1999). A copy of said Life Expectancy Tables is annexed hereto

The basis for the amount set forth in 9k., is the plaintiff's recollection of her out of pocket expenses for such items as medications, bandages, gauze, vitamins ointments, creams, which were and continue to be needed for and used in the care of the injury; as well as the costs of transportation to and from doctors, hospitals and clinics for the care of the injury. Plaintiff is not in posesion of documents, bills, receipts on which this amount is based.

The basis of the amount as set forth in 9l. Is the plaintiff's understanding of what her out of pocket costs will be in the future for the care of the scarring at the injury site both with and without revision surgery and the need for lifetime maintenance and protective care of the scarring at the injury site. The basis for such costs are from information relayed to the plaintiff and for which the plaintiff is not in posesion of any documents.

Dated: Bronx, New York
      May 27, 2008

x _Nicole Ebron_
Nicole Ebron

Sworn to this 18th day of
June, 2008

Eric F. Popkin
Notary No.: 02P06005410
Qualified in N.Y., County
Exp. Date : 4/13/10