UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
NICOLE EBRON,                                              :
                                                           :
                    Plaintiff,                             :
                                                           :   ECF CASE
          v.                                               :
                                                           :   08 Civ. 144 (AJP)
THE UNITED STATES OF AMERICA,                              :
                                                           :
                    Defendant.                             :
                                                           :
------------------------------------------------------------x

# THE GOVERNMENT'S PROPOSED
# FINDINGS OF FACT AND CONCLUSIONS OF LAW

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York,
*Attorney for Defendant*
86 Chambers Street, Third Floor
New York, New York 10007
Telephone: (212) 637-2721
Facsimile: (212) 637-2686

TOMOKO ONOZAWA
SERRIN TURNER
Assistant United States Attorneys
        – Of Counsel –

Defendant the United States of America (the "Government") by and through its attorney Michael J. Garcia, United States Attorney for the Southern District of New York, respectfully submits these proposed findings of fact and conclusions of law in advance of the trial of this action, scheduled to begin on September 22, 2008.

**FINDINGS OF FACT**

1. Plaintiff Nicole Ebron was born on May 2, 1968. At the time of the events giving rise to this lawsuit she was 35 years of age.

2. The defendant is the United States of America. This action and the underlying administrative claim were timely brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b).

3. Pursuant to section 224(g)-(j), (m) of the Public Health Service Act, 42 U.S.C. § 233(g)-(j), (m), and sections 3 through 8 of the Federally Supported Health Centers Assistance Act of 1995, Pub. L. No. 104-73, 109 Stat. 777, 777-81, the Institute for Urban Health (formerly known as the Institute for Urban Family Health) and its employees were deemed to be employees of the United States effective July 1, 2001.

4. The Parkchester Family Practice ("Parkchester"), located at 1597 Unionport Road, Bronx, New York, is an approved delivery site of The Institute for Family Health.

5. At the time of the events giving rise to this lawsuit, Dr. Eric Gayle, M.D. ("Dr. Gayle") and Bettie Laverne Gilmore, L.P.N. ("Nurse Gilmore"), were employees of Parkchester and The Institute for Family Health.

6. Plaintiff had been a patient at Parkchester since 1998. Until the events giving rise to this lawsuit in January 2004, Dr. Gayle was plaintiff's primary care physician.

7. Before the events giving rise to this lawsuit, plaintiff had no complaints about Dr. Gayle and Nurse Gilmore.

8. On January 2, 2004, plaintiff was seen by Dr. Gayle for a routine physical examination.

9. During the exam, Dr. Gayle advised that plaintiff receive a Tetanus-diphtheria vaccination, because her last vaccination was in 1993.

10. The Centers for Disease Control of the U.S. Department of Health and Human Services ("CDC") guidelines advise that adults receive this vaccine every 10 years.

11. Dr. Gayle apprised plaintiff of the known risks of receiving the tetanus vaccination—specifically, redness or soreness at the site, and the risks of contracting Guillan Barre Syndrome.

12. On January 2, 2004, Dr. Gayle also ordered that plaintiff's blood be drawn for a routine blood test.

13. Plaintiff consented to the vaccination and the blood draw.

14. Nurse Gilmore administered the blood draw first, and the vaccination afterwards. Both the blood draw and the vaccination were done on plaintiff's left arm.

15. There was a sufficient supply of alcohol swipes in the examination room where plaintiff received both the blood draw and the vaccination on January 2, 2004.

16. Before Nurse Gilmore took the blood sample, pursuant to her usual custom and practice, and pursuant to written guidelines prepared by The Institute for Family Health, Nurse Gilmore explained to plaintiff that Dr. Gayle had ordered a tetanus vaccine for her. She also informed plaintiff that the side effects of the tetanus vaccine included symptoms of redness, heat, and swelling at the site of the injection.

17. In addition, Nurse Gilmore gave plaintiff a copy of a two-page sheet entitled "Tetanus and Diphtheria Vaccine (Td): What you need to know before you or your child gets the

vaccine," prepared by the CDC. The sheet outlines the benefits and risks of receiving the tetanus vaccination.

18. On an "edit note" that is part of plaintiff's computerized medical records, Nurse Gilmore recorded that she had shown plaintiff a copy of this sheet.

19. Before she drew plaintiff's blood sample, Nurse Gilmore cleaned her hands, put on latex gloves, and retrieved an alcohol swipe from a drawer in the examination room. She cleansed the site of the blood draw with an alcohol swipe, wiped it dry with a piece of gauze, and applied a tourniquet. No complications arose from the site of the blood draw.

20. Before administering the tetanus vaccination, Nurse Gilmore retrieved a second alcohol swipe, cleaned the site of the injection with the alcohol swipe, and wiped the site dry with a piece of gauze.

21. There is no evidence in the plaintiff's medical records that Nurse Gilmore failed to clean the site of the injection properly.

22. After administering the tetanus vaccination, Nurse Gilmore directed plaintiff to remain in the clinic for 20 minutes, and to report any adverse reactions to her immediately. Plaintiff did not have any adverse reactions to the vaccination on January 2, 2004.

23. Between January 3, 2004 and January 11, 2004, plaintiff experienced redness, heat, swelling and pain at the site of the injection, and periodically rubbed and touched the site of the injection.

24. Ten days after receiving the vaccine, on January 12, 2004, plaintiff returned to Parkchester with complaints of pain, swelling, and burning at the site of the injection. She was seen by Dr. Gayle that day.

25. According to her medical records, plaintiff told Dr. Gayle that the band-aid that covered the injection site caused her to have a reaction and caused her skin to peel. Upon

examination, Dr. Gayle observed that the skin was red, peeling, warm, and tender, and diagnosed plaintiff with a skin infection called cellulitis. He advised plaintiff to apply warm compresses to the area, to take Tylenol for the pain, and prescribed a ten-day course of Biaxin, an antibiotic.

26. According to plaintiff's medical records, plaintiff was seen on January 13, 2004, at the emergency room of Jacobi Medical Center in Bronx, New York.

27. At this time, plaintiff was found to have an abscess over the left deltoid muscle around the site of the injection that required surgical incision and drainage and yielded 15 cc of purulent material.

28. According to plaintiff's medical records, plaintiff's wound was covered with Iodoform gauze and she received a sling for her arm. She also received local wound care instructions, and a prescription for Percocet and tetracycline, that was to replace her previous prescription for Biaxin.

29. According to plaintiff's medical records, plaintiff had follow up appointments at Jacobi Medical Center on January 14, 16, and 18, 2004. The records documented clinical improvement and evidence of early wound healing.

30. On January 21, 2004, plaintiff returned to Parkchester with her friend for a follow up appointment on her skin infection. According to plaintiff's medical record of that visit, plaintiff told Nurse Gilmore that her arm "feels much better."

31. Dr. Gayle examined plaintiff on January 21. According to the medical record of that day's visit, plaintiff told Dr. Gayle that, on January 13, the day after her last visit to Parkchester, she had to go the emergency room at Jacobi Medical Center and had "major surgery" on the infected area which involved an incision and draining.

32. Dr. Gayle examined the wound and observed that it was an 0.5 cm open wound that was clean, had no drainage or tenderness, and was healing well. During this visit, Dr. Gayle

explained to plaintiff that when the skin is broken by an injection, it can sometimes cause an infection.

33. According to medical records of the January 21 visit, plaintiff told Dr. Gayle that she had applied alcohol to the site of the injection and that the band-aid covering the site of the injection had caused her skin to peel. Dr. Gayle discussed the possibility that plaintiff had suffered an allergic reaction to the band-aid, and added that applying alcohol to the site could have contributed to the problem by drying out and irritating the skin.

34. Although Dr. Gayle recommended a follow-up examination for plaintiff in a week's time, plaintiff did not go to Parkchester after January 21, 2004.

35. Plaintiff's medical records show that she visited Jacobi Medical Center on March 8, 2004. Plaintiff's physical examination showed evidence of a healed scar over the previous injection site that was neither tender nor erythematous.

36. Plaintiff has not sought medical attention for the site of the injection since March 2004.

37. Plaintiff currently has a well-healed, 0.4-centimeter non-tender, nodular scar at the site of the injection.

38. On August 8, 2008, Dr. Kyu Y. Rhee, M.D., conducted an independent medical examination of plaintiff. His examination revealed that she has a full range of motion at all joints, normal sensation and strength, and that she currently denies any specific complaints or disabilities.

## CONCLUSIONS OF LAW

39. The Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), is a statutory waiver of the federal government's sovereign immunity with respect to certain tort claims arising out of the conduct of its employees. *Devlin v. United States*, 352 U.S. 525, 530 (2d Cir. 2003) (citing 28 U.S.C. § 1346(b)).

40. The FTCA provides in pertinent part:

> [T]he district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable for the claimant in accordance with the law of the place where the act or omission occurred.

*See* 28 U.S.C. § 1346(b)(1).

41. The FTCA also provides that "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages." *See* 28 U.S.C. § 2674.

42. Under the FTCA, the Government is liable for the torts of its employees in the same manner as a private party, *see* 28 U.S.C. § 2674, and that liability is determined "in accordance with the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b). *See Molzof v. United States*, 502 U.S. 301, 305 (1992); *see also Richards v. United States*, 369 U.S. 1, 11 (1962) (holding that "law of the place" means court must apply whole law of state in which act of negligence allegedly occurred).

43. Because the alleged malpractice in this case occurred at the Parkchester Family Practice in the Bronx, New York tort law applies.

A. **DR. GAYLE AND NURSE GILMORE PROPERLY INFORMED PLAINTIFF OF THE KNOWN RISKS OF RECEIVING THE TETANUS VACINATION**

44. New York law defines lack of informed consent to mean:

> [T]he failure of the person providing the professional treatment or diagnosis to disclose to the patient such alternatives thereto and the reasonably foreseeable risks and benefits involved as a reasonable medical, dental or podiatric practitioner under similar circumstances would have disclosed, in a manner permitting the patient to make a knowledgeable evaluation.

N.Y. Pub. Health Law § 2805-d.

45. To prevail on her informed consent cause of action, plaintiff must prove by a preponderance of the evidence: "(1) that [the] medical provider failed to disclose alternatives thereto and failed to inform the patient of reasonably foreseeable risks associated with the treatment, and the alternatives, that a reasonable medical provider would have disclosed in the same circumstances, (2) that a reasonably prudent patient in the same position would not have undergone the treatment if he or she had been fully informed, and (3) that the lack of informed consent is a proximate cause of the injury." *Johnson ex rel. Johnson v. Columbia Univ.*, No. 99 Civ. 3415 (GBD), 2003 WL 22743675, at *16 (S.D.N.Y. Nov. 19, 2003); *see also Avakian v. United States*, 739 F. Supp. 724, 731 (N.D.N.Y. 1990).

46. Under New York law, risks "too commonly known to warrant disclosure" need not be disclosed. N.Y. Pub. Health Law § 2805-d(4)(a).

47. Moreover, "[w]here the record in a professional malpractice case demonstrates that an intervening cause was responsible for the injury," the defendant cannot be held liable. *Brooks v. Lewin*, 800 N.Y.S.2d 695, 698 (1st Dep't 2005); *Merritt v. Saratoga Hosp.*, 750 N.Y.S.2d 140, 142 (3d Dep't 2002).

48. Under New York law, a plaintiff making an informed consent claim must "adduce expert medical testimony in support of the alleged qualitative insufficiency of the consent."

N.Y.C.P.L.R. § 4401-a; *see also Rodriguez v. New York City Health and Hosps. Corp.*, 858 N.Y.S.2d 99, 101 (1st Dep't 2008) ("Where a plaintiff fails to adduce expert testimony establishing that the information disclosed to the patient about the risks inherent in the procedure is qualitatively insufficient, the cause of action for medical malpractice based on lack of informed consent must be dismissed.").

49. Plaintiff's claim for lack of informed consent must be dismissed because plaintiff's expert report is devoid of any opinion regarding what a reasonable medical practitioner under the circumstances here would have disclosed.

50. Plaintiff also has not met her burden of proving lack of informed consent by a preponderance of the evidence. The evidence shows that Dr. Gayle and Nurse Gilmore properly informed plaintiff of the known risks of receiving the tetanus vaccination, both verbally and by providing her with a copy of the CDC information sheet that listed the benefits and risks of the tetanus vaccination.

51. It was acceptable practice for Dr. Gayle and Nurse Gilmore to not inform plaintiff that the act of breaking the skin with a medical instrument could lead to a bacterial infection. While rare, bacterial infections are a known risk or complication of any breach of skin by any medical instrument. Accordingly, it is not routine practice for patients to be counseled about the risk of infection from a break in the skin during a vaccination.

52. The doctrine of informed consent addresses a doctor's failure to inform a patient of the reasonably foreseeable risks of *professional treatment or diagnosis*—not the reasonably foreseeable risks of committing malpractice. *See* N.Y. Pub. Health Law § 2805-d. Otherwise, every act of malpractice would automatically include a claim for lack of informed consent as to that act of malpractice. Thus, to the extent plaintiff's claim for lack of informed consent is premised on Nurse Gilmore's alleged failure to inform her that administering a shot without

disinfecting the site first can lead to a bacterial infection, that claim should be dismissed as duplicative of her medical malpractice claim.

**B.    DR. GAYLE AND NURSE GILMORE DID NOT COMMIT MEDICAL MALPRACTICE**

53.    To prevail in a medical malpractice action under New York law, the plaintiff must prove: "(1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries." *Milano by Milano v. Freed*, 64 F.3d 91, 95 (2d Cir. 1995) (quoting *Arkin v. Gittleson,* 32 F.3d 658, 664 (2d Cir.1994)).

54.    Under New York law, a physician breaches the standard of care if he:

> lacks or fails to exercise the level of knowledge, care, and skill that is expected of the average physician in the same locality and of the same class of physicians to which he belongs, or (2) fails to use his best judgment in applying his knowledge and skill.

*Ford v. United States*, No. 98 Civ. 6702 (THK), 2000 WL 1745044, at *4 (S.D.N.Y. Nov. 27, 2000).

55.    "The law recognizes that there are differences in the abilities of doctors, just as there are differences in the abilities of people engaged in other activities.  To practice medicine a doctor is not required to have the extraordinary knowledge and ability that belongs to a few doctors of exceptional ability.  However every doctor is required to keep reasonably informed of new developments in his field and to practice medicine in accordance with approved methods and means of treatment in general use.  The standard of knowledge and ability to which the doctor is held is measured by the degree of knowledge and ability of the average doctor in good standing in the medical community in which the doctor practices." *Perez v. United States*, 85 F. Supp. 2d 220, 221-22 (S.D.N.Y. 1999), *aff'd* 8 Fed. Appx. 48 (2d Cir. 2001) (quoting 1A New York Pattern Jury Instructions-Civil 2:150 (3d ed. 1998)).

56. Proximate cause is established where an alleged deviation from the standard of care was a "substantial factor" in producing the injury. *See Greenfield v. Memorial Sloan Kettering Hosp.*, No. 95 Civ. 7658 (KTD), 2000 WL 351395, at *5 (S.D.N.Y. Apr. 15, 2000); *Kennedy v. Peninsula Hosp. Ctr.*, 522 N.Y.S.2d 671, 674 (2d Dep't 1987); *see also Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 314-15, 414 N.E.2d 666, 670 (N.Y. 1980).

57. In order to prevail, a plaintiff must establish that negligence was *more likely than not* the cause" of her injuries. *Perez*, 85 F. Supp. 2d at 226 (emphasis added) (quoting *Shepard v. United States*, 811 F. Supp. 98, 103 (E.D.N.Y. 1993)); *see also Ingersoll v. Liberty Bank of Buffalo*, 278 N.Y. 1, 7, 14 N.E.2d 828, 829-30 (N.Y. 1938).

58. New York law further provides that expert medical opinion testimony is required to make out both elements of medical malpractice. *See Sitts v. United States*, 811 F.2d 736, 739-40 (2d Cir. 1987) (citing New York cases and concluding "[i]t is well established in New York law that unless the alleged act of malpractice falls within the competence of a lay jury to evaluate, it is incumbent upon the plaintiff to present expert testimony in support of the allegations to establish a prima facie case of malpractice" (internal quotations marks omitted)), *see also Milano by Milano v. Freed*, 64 F.3d 91, 95 (2d Cir. 1995); *Hegger v. Green*, 646 F.2d 22, 28 (2d Cir. 1981); *Ford*, 2000 WL 1745044, at *4, *10; *Perez*, 85 F. Supp. 2d at 226; *Lyons v. McCauley*, 675 N.Y.S.2d 375, 376-77 (2d Dep't 1998) (in medical malpractice actions under New York law, "[e]xpert testimony is necessary to . . . establish proximate cause unless the matter is one which is within the experience and observation of the ordinary juror").

59. Defendant cannot be found liable in this case "solely for a poor result." *Jones v. United States*, No. 83 Civ. 6785, 1986 WL 1459, at *4 (S.D.N.Y. Jan. 28, 1986). Thus, "[t]he existence of an undesirable result alone does not constitute malpractice." *Id.* at *6. All that the law requires is that a physician "use the skill and learning of the average physician [in his field],

- 10 -

to exercise reasonable care and to exert his best judgment in the effort to bring about a good result." *Id.* at *4 (internal quotation marks and citations omitted).

60.  Failure to cleanse the site of an injection before administering a vaccination is a deviation from the standard of care in the relevant medical community.

61.  However, plaintiff has not proven, by a preponderance of the credible evidence, that Nurse Gilmore failed to clean the site of the injection with a disinfectant before administering the tetanus vaccination.

62.   Plaintiff's claim of medical malpractice arising from Dr. Gayle's decision to prescribe Biaxin and Tylenol on January 12, 2004, must be dismissed because plaintiff's expert report is devoid of any opinion that Dr. Gayle, in issuing this prescription: (1) lacked or failed to exercise the level of knowledge, care, and skill that is expected of the average physician in the same locality and of the same class of physicians to which he belongs; or (2) failed to use his best judgment in applying his knowledge and skill.

63.  Most cases of cellulitis are caused by Staph Aureus or Streptococcus bacteria which can be treated by the antibiotic Biaxin.

64.  In addition, plaintiff had a documented allergy to penicillin.  Biaxin is an acceptable and appropriate choice for cellulitis in patients with documented allergies to penicillin and/or penicillin-like drugs.

**C.    IF THE COURT DETERMINES THAT THERE WAS MEDICAL MALPRACTICE, PLAINTIFF IS ENTITLED TO ONLY MODEST DAMAGES FOR PAIN AND SUFFERING, AND NO ECONOMIC DAMAGES**

65.   "Damages in FTCA actions are determined by the law of the state in which the tort occurred." *Ulrich v. Veterans Admin. Hosp.*, 853 F.2d 1078, 1081-82 (2d Cir. 1988).

66.  To recover any damages, plaintiff must prove damages by a preponderance of the credible evidence. *See Battista v. United States*, 889 F. Supp. 716, 724 (S.D.N.Y. 1995).

67. Plaintiff must show damages that are susceptible of ascertainment in a manner other than mere speculation. *See Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946).

68. Claims for past medical expenses must be supported by documentary evidence such as medical bills. *See, e.g., Cardella v. Henke Machine Inc.*, 726 N.Y.S.2d 734, 739-40 (3d Dep't 2001) (disallowing claim for past medical expenses where "record contain[ed] no billings or other proof indicating what services comprise" amount stipulated to); *O'Connor v. Rosenblatt*, 714 N.Y.S.2d 327, 328 (2d Dep't 2000) ("the award of damages for past medical expenses was unsupported by competent evidence").

69. An award for future medical expenses also may not be speculative. *See, e.g., Lloyd v. Russo*, 709 N.Y.S.2d 589, 589-90 (2d Dep't 2000).

70. In addition, the FTCA provides that "[n]o attorney shall charge, demand, receive, or collect for services rendered, fees in excess of 25 per centum of any judgment rendered pursuant to section 1346(b) of this title . . . ." 28 U.S.C.A. § 2678.

71. Finally, any damage amount awarded must be reduced to present value. *See Oliveri v. Delta Steamship Lines, Inc.*, 849 F.2d 742, 746, 751 (2d Cir. 1988) (pain and suffering award should be assessed at present value).

72. Plaintiff has not produced any evidence, such as medical bills or other documentation, concerning the costs of any medical or psychiatric treatment to support a claim for damages in connection with the costs of her medical care.

73. Plaintiff therefore is not entitled to any damages for past or future medical care. *See Swendowski v. Ethicon*, 775 N.Y.S.2d 718, 719 (4th Dep't 2004) (affirming decision not to instruct jury on medical expenses where plaintiff failed to produce evidence of cost); *Faas v.*

*State of New York*, 672 N.Y.S.2d 145, 147 (3d Dep't 1998) ("It is well settled that an award for future medical expenses may not be based upon mere speculation.").

74.  Plaintiff's medical bills are paid entirely by Medicaid.  Because plaintiff did not have to pay for any medical care related to the treatment of her arm, she should not be permitted to recovery for any expense that was provided free of charge.  *See* New York Pattern Jury Instruction-Civil 2:300 (Dec. 2007).

75.  Plaintiff seeks damages for pain and suffering.  In determining the appropriate amount of damages, if any, for pain and suffering, the Court is bound by a standard of reasonableness.  *See Battista*, 889 F. Supp. at 727.

76.  Plaintiff's scar is on her left deltoid, is well-healed, and is minor—approximately 0.4 cm to 0.5 cm in length.  It does not affect her mobility or her capacity to function in any way.

77.  Plaintiff has not sought any medical or mental-health counseling in connection with her scar.

78.  Plaintiff claims she suffers from "shooting pains" in her left arm before it snows or rains, but she does not have any documentary or other medical evidence showing that such pain is caused by the scar on her arm.   Plaintiff also has never consulted a doctor for a diagnosis for these pains.

79.  Although there are no reported jury or judge awards for pain and suffering in vaccination shot cases that led to a scar similar to plaintiff's, the closest analogies are cases involving scars caused by animal bites or other accidents.  *See Paolini v. Sienkiewicz*, 719 N.Y.S.2d 408 (4th Dep't 2000) (holding that evidence only supported $5,000 award for future pain and suffering over a two-year period where plaintiff had a significant disfigurement from 3 cm-long scar on forehead) *Patterson v. Conrad*, 1992 WL 520432 (Ohio Com. Pl., 1992) (jury verdict for $5,800 in pain and suffering for 49-year-old female who suffered soft tissue injuries

with a small scar on her leg during a rear-end collision); *Eiselben v. Torchia*, 1992 WL 438483 (N.Y. Supreme Court, Oneida County, 1992) (jury verdict for $3,000 in pain and suffering, where 44-year-old male sustained a dog bite to left forearm, resulting in a small scar, but could not prove claims of permanent nerve damage purportedly caused by dog bite).

80. In light of the above verdicts and settlements, and all the circumstances, a reasonable damages award for pain and suffering should not exceed $5,000.

Dated: New York, New York
September 9, 2008

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
*Attorney for Defendant*

By:   /s/ Tomoko Onozawa
TOMOKO ONOZAWA
SERRIN TURNER
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
Telephone: (212) 637-2721 (Onozawa)
(212) 637-2701 (Turner)
Facsimile: (212) 637-2686
E-mail: tomoko.onozawa@usdoj.gov
serrin.turner@usdoj.gov